## HUNTINGTON DEVELOPMENT & GAS CO. v. STEWART.

### No. 2980.

Circuit Court of Appeals, Fourth Circuit.
Oct. 21, 1930.

COCHRAN, District Judge, dissenting.

W. C. Renshaw, of Huntington, W. Va. (Harold A. Ritz, of Charleston, W. Va., on the brief), for appellant.

W. T. Lovins, of Huntington, W. Va., for appellee.

Before NORTHCOTT, Circuit Judge, and GRONER and ERNEST F. COCHRAN, District Judges.

NORTHCOTT, Circuit Judge.

This is an action of ejectment instituted by appellant, a Delaware corporation, in the District Court of the United States for the Southern District of West Virginia, against appellee and four other defendants. Trial was had as to Allie Stewart, appellee, alone, and was as to the mineral estate underlying a 31-acre tract of land claimed by her, situate in Lincoln county, W. Va. No claim was made by the appellant as to the surface. The appellee, who will be referred to as the defendant, claimed the land in fee simple.

The plaintiff and defendant have a common source for their respective claims of title, the plaintiff, under a disclaimer, in effect, a quitclaim deed, from Samuel A. Bias and J. A. Bias, disclaiming ownership of all the coal, iron, oil, gas, and other minerals in or under a tract of 225 acres, which tract, it was claimed by the plaintiff, included the 31-acre tract in controversy. This disclaimer of the Biases was dated the 23d day of September, 1889. Samuel A. and J. A. Bias, in November, 1903, deeded a 96-acre tract, including the 31 acres in question, to Rosa Stewart, who, together with her husband, deeded the 31 acres to the defendant, Allie Stewart, on March 1, 1906. There are no qualifications, as to the title, in either of the deeds to the Stewarts, and both deeds are apparently for the fee-simple title.

The disclaimer or quitclaim deed from the Biases to the plaintiff was a result of a compromise of an action in ejectment against the Biases and a number of others, involving parts of a tract of 100,000 acres, claimed under certain ancient grants issued by the state of Virginia to General Samuel Smith toward the close of the eighteenth century.

The defendant moved on the 31 acres in 1906, and inclosed it by a fence, and she or some of her family have resided on it ever since. No coal has ever been opened on this land, and no development for oil or gas or any other mineral attempted prior to September, 1928, when plaintiff attempted to locate a gas well on same, and was stopped by the defendant. In 1909 the courthouse of Lincoln county was burned, and all of the county records destroyed. On the 28th of March, 1911, the disclaimer from the Biases was presented to W. C. Holstein, clerk of the county court of Lincoln county, to be again recorded, and was admitted to record anew. The document presented in 1911 bore upon its back the following endorsement:

"Disclaimer Samuel Bias and Jerusha A., his wife, 225 acres, Trace Creek, Recorded in Release Docket ——, page 353, Lincoln County, W. Va., H. Hager, Clerk, Ex. No. 14."

The deed of the defendant from Rosa Stewart was admitted for recordation anew on November 10, 1910, and the deed showed that it had been first recorded in the county clerk's office on June 12, 1907. The record shows that H. Hager was county clerk of Lincoln county from 1887 to 1895, and that he was not county clerk of the county after the year 1895.

The land was charged on the land books of Lincoln county to the defendant in fee during the entire time defendant has owned it, and she has paid taxes thereon for entire time, except for year 1929.

Upon the trial the learned judge below directed a verdict for the defendant on ground of adverse possession, for more than ten years under color of title, from which action this appeal was taken.

That the plaintiff by its evidence located the 31-acre tract within the boundary of the 225-acre tract, the mineral rights of which were conveyed by the disclaimer, seems clear from the record. On this point, the judge below in his charge to the jury said:

"The plaintiff has introduced evidence tending to show the location of their land and that that location includes the land in controversy. There has been no real dispute by the defendant of that testimony. The plaintiff has shown a title under circumstances, which I believe, would probably permit the same to go to a jury."

■■ It is well settled in West Virginia that there can be a severance of the mineral estate, from the surface, in a tract of land, and two separate and distinct estates therein are thereby created, and that such severance makes them distinct corporate hereditaments. Where such severance has taken place, possession of the surface does not constitute possession of the underlying minerals, and is not hostile to the title of the mineral owner. Wallace v. Elm Grove Coal Co., 58 W. Va. 449, 52 S. E. 485, 6 Ann. Cas. 140; Kiser v. McLean, 67 W. Va. 294, 67 S. E. 725, 140

Am. St. Rep. 948. This court has recognized this rule. Vance v. Clark (C. C. A.) 252 F. 495; Miller v. Estabrook (C. C. A.) 273 F. 143, 149.

The West Virginia statute with reference to adverse possession is section 1, chapter 104, of the Code of 1923, and reads as follows:

"1. *Recovery of Lands.*—No person shall make an entry on, or bring an action to recover, any land, but within ten years next after the time at which the right to make such entry or to bring such action shall have first accrued to himself or to some person through whom he claims."

In the case of Miller v. Estabrook, supra, this court passed upon many of the questions involved in the instant case, and there laid down the rule, clearly sustained by authority, that those who purchased and held what purported to be the fee, under one who had severed the surface and minerals, would not be bound by such severance, "unless they had actual or constructive notice." The court went on to state that the vital question then was whether there was such a recordation of the deed as to charge those deriving title from him who had severed the surface and minerals with constructive notice of the severance. In the event of such notice, the adverse possession of the surface would be therefore ineffectual to defeat the title of those who claim the mineral estate. As we see it, a precisely similar situation exists here; the question being whether or not there was such recordation of the disclaimer or quitclaim deed from the Biases as would put the defendant, Allie Stewart, upon constructive notice of the severance of the minerals from the surface. As to whether or not the defendant had actual notice of such severance and of the claim of the plaintiff, the record is not clear. It is true that the defendant testified that she did not learn that the plaintiff was asserting any claim to the minerals under her land until September, 1928, but she did not testify that she did not know of the severance of the mineral estate by the Biases before her purchase of the 31-acre tract, and this she certainly should have done, if such were the fact. Her testimony that she did not know of the plaintiff's claim is not broad enough to include the fact that she did not know of the severance.

On the question of her constructive notice, that is, the question of whether or not the disclaimer or quitclaim deed of the Biases was recorded in the county clerk's office of Lincoln county prior to her purchase in 1906, we are of the opinion that the testimony, which must on this motion be viewed in the light most favorable to the plaintiff, shows the prior recordation of the disclaimer. At least it is shown with sufficient proof to allow the case to go to the jury on that point.

This court has held in Vance v. Clark, supra, and in Dingess v. Gas Co., 271 F. 864, that title papers similar to those involved in this case were sufficient for plaintiff to recover, and has also held in Miller v. Estabrook, supra, and again in Woodall v. Estabrook et al., 273 F. 152, that disclaimer or mineral deeds, similar to the one involved here, passed title to the mineral estate, and were properly recorded, when recorded, as was the one here involved, in the "Release Docket."

If H. Hager recorded the "Disclaimer" deed, as his notation shows that he did, it must have been prior to the year 1895, for that was the last year in which he was clerk. It was therefore prior to defendant's purchase of the land in 1906, and thus she had constructive notice of the severance.

Supporting the notation of H. Hager, as clerk, is the evidence of W. R. Talbott, whose testimony was perpetuated under the West Virginia statute, to the effect that, in searching the records of Lincoln county, prior to the fire, he found the Biases' disclaimer deed recorded. At the time of the perpetuation of the Talbott testimony, the defendant was represented by counsel, and must therefore have known of the severance of the minerals from the surface estate, by the Biases, long before 1928. The perpetuation of the Talbott testimony, however, took place more than ten years after the purchase and possession of the 31-acre tract by the defendant, and could not affect her adverse possession had she not had constructive notice through the recordation of the disclaimer or quitclaim deed.

Some contention is made as to flaws in the plaintiff's title running back to the commonwealth of Virginia, but, where both plaintiff and defendant derive title from a common source, it is sufficient for the plaintiff to prove such common source.

"In actions of ejectment where both plaintiff and defendant derive title from the same third person, the rule is well settled that it is prima facie sufficient for plaintiff to prove such common derivation of title without proving that such third person had title to the land in controversy." Laidley v. Land Co., 30 W. Va. 505, 4 S. E. 705.

The fact that the original quitclaim deed was not offered in evidence has given us some concern. Should the case be tried again, the original deed should be offered or some explanation given as to why it is not done.

Some other points were raised in the case, but, in view of our conclusion as to the constructive notice to the defendant, it is not necessary to discuss them here. There was at least sufficient evidence to take the case to the jury, and the judge below was in error in directing a verdict for the defendant. Reversed and remanded for a new trial.

Reversed.

ERNEST F. COCHRAN, District Judge (dissenting).

I am in accord with the opinion of the majority of the court in this case, except upon the question of notice. In my opinion, the practical result of this decision is to allow a party to prove a burnt record by a second recording when the statute providing for the restoration of burnt records has not been complied with. In view of the importance of the matter, I deem it advisable to state the reasons why I am compelled to dissent from the majority view.

In considering the matter, inasmuch as the District Judge directed a verdict for the defendant, it will be necessary to take the evidence in its aspect most favorable to the plaintiff. There can be no doubt, and counsel practically conceded, that the evidence showed beyond dispute that Allie Stewart held adverse possession of the premises under a deed executed in 1906 for more than the statutory period of ten years. This adverse possession of the surface by the defendant must prevail over the claim of the mineral rights by the plaintiff, unless it be shown by the plaintiff that the defendant had either actual or constructive notice of the severance of the mineral rights.

In making proof of constructive notice, it was a vital link in plaintiff's evidence to show that the name of H. Hager, the former clerk, was upon the back of the original disclaimer deed, and that it was his signature, or that his name was placed there by his authority. My view is that there was no evidence whatever to show that fact, except the recording the second time of the disclaimer deed; and that such recording, not being in compliance with the statute, was incompetent to prove that essential fact. In order to bring this out clearly, it will be necessary to set forth certain of the facts more in detail.

In order to show constructive notice, the plaintiff offered in evidence a *certified copy* of the disclaimer deed as recorded the *second time;* namely, March 28, 1911. The original disclaimer deed was not produced nor its absence accounted for. The certified copy showed a note of certain indorsements on the back of the deed, which will be set forth and referred to later. The defendant made timely objection to the introduction of this certified copy, and, upon objection being overruled, excepted to the ruling.

The plaintiff also offered the testimony of W. R. Talbott, which had been perpetuated under the West Virginia statute. He testified that he made notes at various times between September, 1908, and December, 1909, of various tracts of land on the record, and among them the disclaimer deed. Neither by his testimony nor by his notes is it shown *when the disclaimer deed was first recorded.* All that his testimony and notes show is that the deed was on record at some time between September, 1908, and December, 1909. The records were destroyed by fire on November 19, 1909.

The plaintiff claims that from the indorsements, which, according to the certified copy, appear on the disclaimer deed, and the testimony and notes of Talbott, it is shown that the disclaimer deed was on record prior to April 23, 1897, and, as the defendant did not acquire her title or come into possession until March 1, 1906, she must therefore have had constructive notice of the severance. The plaintiff's argument is in substance that the certified copy of the disclaimer deed shows H. Hager's indorsements on the original deed; that the testimony shows that H. Hager ceased to be clerk at least as early as April 23, 1897; that Talbott found the disclaimer deed on the record between September, 1908, and December, 1909; and that therefore the deed was on record prior to April 23, 1897. It is obvious that this conclusion depends on whether there is any competent evidence to show that the signature of H. Hager was on the back of the original disclaimer deed. The indorsements on the back of this deed, as shown by the certified copy, do not show any date of the first record. If there was no competent evidence of the fact that the original disclaimer deed bore the signature or name of H. Hager, then the plaintiff's argument falls to the ground; for all that Talbott's evidence shows is that the deed was on record at some time between September, 1908, and December, 1909. The only evidence of what indorsements were upon the original disclaimer deed

is found in the certified copy of the same as recorded the second time. These indorsements, as taken from the certified copy, are as follows:

"West Virginia,

"Lincoln County, County Court Clerk's Office.

"This writing was this day presented to me and the same is admitted to record.

"Teste: Clerk L. Co. C.

"Note: The following indorsement was on the back of the above instrument: 'Disclaimer Samuel Bias and Jerusha A. his wife, 225 acres, Trace Creek, Recorded in Release Docket ——, page 353, Lincoln County, W. Va., H. Hager, Clerk, Ex. No. 14.' Clerk's Office of the County Court of Lincoln County, 28th day of March, 1911, to-wit: The deed book containing the record of the foregoing deed and certificates of acknowledgment, and certificate of recordation thereof, having been lost by fire consuming the records of the said Clerk's Office, occurring on the 19th day of Nov., 1909, the foregoing deed of disclaimer was this day presented to me, the Clerk of the said Court, in the Clerk's Office aforesaid, for records anew. And thereupon, the said deed together with the certificates of acknowledgment and certificate of recordation, have, by me, been duly admitted to record anew in said Clerk's Office.

"Given under my hand this 28th day of March, 1911.

"W. C. Holstein,

"Clerk County Court of Lincoln County."

There can be no doubt that the recording of the disclaimer deed anew on March 28, 1911, *operated as constructive notice from that time forward*. But it is equally clear that such recording anew could not operate to show that the deed had been recorded prior to that time, in the absence of a statute providing therefor; and it is hardly necessary to cite authority for the proposition that, where statutory provisions exist for the restoring of lost or burned records, the conditions prescribed by the statute must be complied with before the second recordation can be any evidence of a proper recordation prior to the destruction of the records. It is undoubtedly true also that, where the second recordation does not comply with the statute, the second recordation is, so far as establishing the fact of the prior record is concerned, a complete nullity, and *neither the second record nor any certified copy thereof is admissible to prove the prior recordation or to prove any fact necessary to establish the prior recordation.*

The West Virginia statutes provide two methods for restoring burned or lost records. The first method is by the clerk's taking testimony as prescribed in Code, West Virginia, chap. 73A, part of sections 1, 3, 5, and 10, as follows:

"1. *Commissioner to Take Testimony.*— Whenever the book or books in which are required to be recorded deeds, wills or other papers relating to the title or boundaries of lands, have been, or may hereafter be burned, lost or destroyed by reason of the burning of the clerk's office of any court, recorder's or surveyor's office, or otherwise, it shall be lawful for the county clerk of the county in which such burning, loss or other destruction took place, to appoint a commissioner to take such testimony in relation to such destroyed or lost title papers as is hereinafter provided. * * *

"3. *Taking of Testimony; Record.*—He shall provide a well bound book at the expense of the county in which to record such testimony as he may take for the purpose aforesaid. Such testimony shall be taken at the clerk's office of the county court, between the hours of nine o'clock a. m., and five o'clock p. m.; and within the period of five years after the taking of the same shall have been commenced. * * *

"5. *How Testimony Taken.*—On the day fixed by said notice, the said commissioner shall attend at the clerk's office of the county court of his county, and there take and record in said book, the testimony of any creditable person that may appear before him, touching the existence or execution of any deed, will, or other title paper which was recorded in any book burned, lost or destroyed, as aforesaid. The witness shall describe the paper as near as may be; if a deed, the names of the grantor and grantee; the date thereof, with the number of acres called for as near as the witness can recollect; the locality of the land conveyed; the name of the tract, if it had any, if improved or unimproved, and if improved, who made the improvement; who lived upon the same, and how long; what the calls were with regard to corners, boundaries, or adjacent lands, and anything else which the commissioner may deem material to describe the title to the land, or to locate the same. * * *

"10. *Admissibility of Evidence or Copies.* —The evidence taken, as aforesaid, shall be admissible in all suits or controversies in relation to the title or boundaries of lands in said county, whenever such evidence is relevant and no higher or better evidence

can be had; copies of said depositions when duly certified by the clerk of the county court of said county, shall be admissible in any court, the same as the original."

There is absolutely no evidence to show that, when Clerk W. C. Holstein recorded the disclaimer deed anew on March 28, 1911, any of the foregoing provisions were complied with, and, indeed, I do not understand that counsel make any such contention.

The second method is found in West Virginia Code, c. 130, § 13, to wit:

"13. *Recording Lost Copies Anew.*— Where any such book, or any book containing the record of wills, deeds or other papers, or where any paper filed in a clerk's office is lost, the clerk in whose office such book or paper was, upon the production to him of any original paper which was recorded in the said book, or any attested copy of the record thereof, or of an attested copy of anything else in such book, or of any papers so filed, shall, on application, record or file the same anew. *The record shall show whether it is made from an original or a copy and how the paper from which it is made was authenticated or attested. Such record shall have prima facie* the same effect that the record or papers for which it is substituted would have had."

Clerk Holstein's certified copy of the second recording does not show *whether it was made from an original, or copy, nor how the paper from which it was made was authenticated* or attested. These omissions in the record are fatal to the second recordation, so far as making it evidence of the former recordation. It is incompetent, and cannot be used to establish in any way the fact of the prior recordation. A fortiori, it cannot be evidence of the fact stated in the note by Clerk Holstein and recorded at the time of the second recordation, to the effect that H. Hager's name appeared on the back of the original deed. There is therefore no competent evidence whatever that H. Hager's name appeared on the back of the original disclaimer deed.

But there are other objections that are equally fatal. The certificate on the original disclaimer deed, which should have been signed by the clerk when originally recorded, is not signed, but left blank; nor is there anything thereon to show the date when the deed was recorded or lodged for record. Assuming that H. Hager's name appears on the back of the deed as shown by the second recordation, there is absolutely no evidence

that it was his signature or placed there by his authority. The record is silent as to when, with whom, and how the disclaimer deed was lodged for record, or admitted thereto, the first time, and the blank notation of recordation is not only *undated*, but *unsigned*. It is nothing more than an unauthenticated indorsement appearing on the disclaimer deed, and cannot be evidence against the defendant.

The certified copy of the disclaimer deed and its notations and indorsements being eliminated as evidence against the defendant, there remains only the evidence of Talbott; but, as already pointed out, that evidence is insufficient. It does not show that the deed was on record *prior to 1908.* The defendant acquired title before that time. There is therefore no evidence of constructive notice.

Upon the question of actual notice, the only evidence offered by plaintiff was notice to the defendant of the taking and perpetuation of Talbott's testimony in 1918. Beyond this there is not a syllable of evidence on the part of the plaintiff to show actual notice. But in 1918 the defendant's adverse possession had ripened into title, and no notice could then impair her rights.

The only relevant evidence on the subject of actual notice came from the defendant herself. She testified that she "did not learn that the plaintiff Huntington Development & Gas Co., was asserting any claim to mineral under her land until they made a location for their well in September of 1928, about a year before the drilling." Counsel for the plaintiff insists that this is not sufficient, in that she did not testify that she did not know of the severance of the mineral estate by the Biases before her purchase, and that she might have known that some of the predecessors of the Huntington Development & Gas Company were asserting this claim. Her counsel did not pursue the examination further on this point, nor did the plaintiff's counsel cross-examine her at all in that respect. From a reading of the record before us, it would seem that both counsel fully understood that the defendant denied any knowledge of the severance; and the point now made for the first time in this court (so far as the record discloses) is apparently an afterthought. Be that as it may, it is immaterial. The burden was not upon the defendant to show that she had no notice. She had shown title by adverse possession, and the burden was then cast upon the plaintiff to defeat that title, so far as the mineral rights were concerned, by showing notice of the sever-

ance. This the plaintiff utterly failed to show.

To sum up briefly: The plaintiff failed to show constructive notice, because one vital link in its chain of evidence was shown only by the second recordation, which did not comply with the statute, and therefore was not competent evidence. Upon the question of actual notice, the plaintiff made no showing at all, and the only evidence upon the subject was favorable to the defendant. The defendant's title was indisputable, unless the plaintiff could show notice. I think, therefore, that the District Judge was right in directing a verdict for the defendant, and that the judgment should be affirmed.